UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

ROBERT L. GARBER, On Behalf of          :
Himself and All Others Similarly
Situated,                               :

                    Plaintiff,          :              **OPINION**

          - against -                   :         06 Civ. 9436 (DC)

LEGG MASON, INC. et al.,                :

                    Defendants.         :

- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/17/08

**APPEARANCES:** (See last page)

**CHIN, District Judge**

In this securities class action, plaintiffs allege that
defendants engaged in an illegal scheme to defraud purchasers of
defendant Legg Mason, Inc. ("Legg Mason") stock by failing to
disclose certain information relating to Legg Mason's "swap" of
certain assets with defendant Citigroup Global Markets Inc.
("Citigroup"). Plaintiffs further allege that this scheme
resulted in an artificial inflation of the stock price and that
when defendants' conduct became apparent to the market, Legg
Mason's stock price fell.

All defendants now move to dismiss the consolidated
amended complaint for failure to state a claim upon which relief
may be granted pursuant to Federal Rule of Civil Procedure
12(b)(6) and for failure to comply with the pleading requirements
of Federal Rule of Civil Procedure 9(b) and the Private
Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).
For the reasons set forth below, the motions are granted.

## A. Facts

For purposes of these motions to dismiss, the facts as alleged in the consolidated amended complaint are assumed to be true.

### 1. Legg Mason

Legg Mason, a global asset management company, was founded in 1962. (Compl. ¶¶ 5, 10). Legg Mason's founder, defendant Raymond "Chip" Mason ("Mason"), started Mason & Co. in Newport News, Virginia in 1962. (Id. ¶ 10). He merged his company with a 71-year-old Baltimore firm, Legg & Co., in 1970, forming Legg Mason. (Id.). Mason has been the Chairman of the Board and Chief Executive Officer ("CEO") of Legg Mason since 1981. (Id. ¶ 6). Defendant Charles J. Daley ("Daley") is Chief Financial Officer ("CFO"), Senior Vice President, and Treasurer of Legg Mason. (Id. ¶ 7). Daley was elected CFO in July 2005, and Senior Vice President, Principal Financial Officer, and Treasurer in January 2002. (Id.).

In 1998, Mason stated that he intended to build Legg Mason, which then had $54 billion in assets under management, into one of the country's fifty largest financial companies. (Id.). It is now the fifth largest U.S.-based global asset management company. (Id. ¶ 10).

Legg Mason currently provides investment management and related services -- both directly and through financial intermediaries -- to institutional and individual clients, company-sponsored mutual funds, and other investment vehicles.

- 2 -

(Id. ¶ 12). The company is divided into three divisions: Mutual Funds/Managed Services, Institutional, and Wealth Management. (Id.). Within each division, it provides its services through asset managers, which are individual businesses contained in one or more different subsidiaries. (Id.). These subsidiaries typically market their products and services under their own brand name. (Id.).

## 2. Legg Mason's Swap with Citigroup

On June 24, 2005, Legg Mason issued a press release announcing that it would swap its brokerage unit plus $2.1 billion in stock and cash for Citigroup's $435 billion worldwide asset management division ("CAM"). (Id. ¶ 13). Specifically, Legg Mason would acquire CAM in exchange for (1) Legg Mason's private client brokerage and capital markets businesses, (2) approximately $1.5 billion of Legg Mason common and non-voting convertible preferred shares, and (3) approximately $550 million in the form of a five-year loan facility provided by Citigroup's Corporate and Investment Bank (together, the "CAM Swap"). (Id.). Additionally, Legg Mason would sign a three-year distribution agreement with Citigroup to distribute its financial products. (Id.).

In an unrelated transaction, Legg Mason announced that it would also buy hedge fund firm Permal Group for an initial payment of $800 million. (Id.). Mason commented on the announcements, stating, in part:

> The business swap with Citigroup should
> benefit both companies. On our part, we
> expect to more than double our assets under

- 3 -

management, broaden our geographical reach into critical global markets and, through a joint three-year global distribution agreement, significantly expand our ability to distribute our retail money management products around the world through a financial powerhouse.

(Id.).

Legg Mason also held an investor conference on June 24, 2005, to discuss the CAM Swap and Permal deals. (Id. ¶ 14). Mason emphasized that both transactions would positively affect Legg Mason's profitability, including leaving it with a "Conservative Balance Sheet." (Id.). Defendants also told investors that the transactions were expected to generate a 9% GAAP EPS increase in the first 12 months following the consummation of the transactions. (Id.).

On December 1, 2005, Legg Mason issued a press release announcing that it had completed the CAM Swap. (Id. ¶ 16). The release stated that the company had acquired almost all of Citigroup's worldwide asset management business for (1) Legg Mason's private client brokerage and capital markets businesses; (2) 5,393,545 newly issued shares of Legg Mason common stock; (3) non-voting convertible preferred stock, convertible upon sale into 13,346,632 shares of common stock; and (4) approximately $500 million cash. (Id.). In commenting on the CAM Swap, Mason stated:

> We have worked exhaustively over the last several months to establish the proper structure and strategy for our integrated global operations, while seeking to insulate our investment management professionals -- and therefore our clients -- from the distractions inherent in many large

- 4 -

acquisitions. While much work remains to be
done in the coming months to rationalize and
fully integrate our operations, we're
delighted now to be able to direct our
energies toward making our vision for the
future a practical reality: moving forward
with our significantly broadened operations
and now singular focus on being one of the
best asset managers in the world.

(Id.).

Early the next year, on February 1, 2006, Legg Mason

issued a press release announcing its financial results for the

quarter ending December 31, 2005. (Id. ¶ 73). The company

reported net income of $0.77 per share from continuing operations

and $850.8 billion under management. (Id.). Mason stated:

The divestiture of our brokerage business,
while certainly difficult on a personal
level, enables us to focus solely on making
Legg Mason, now one of the largest asset
managers in the world, hopefully one of the
most highly regarded asset managers in the
world.

I am both pleased by the results of our
"legacy" Legg Mason asset management business
this quarter and encouraged by the prospects
of the Citigroup Asset Management and Permal
businesses we have acquired. . . .

The quarter also recognizes our capital
gain and related tax bill from the sale of
our brokerage business, as well as certain
transaction-related compensation costs,
including certain retention costs related to
the next six months' transition period. Yet
minimal cost savings or other benefits that
we expect from the consolidation and
rationalization of our businesses are
reflected in this quarter's results.

(Id.).

## 3. **The Secondary Offering: Citigroup's Sale of Legg Mason Shares**

As a result of the CAM Swap, Citigroup (and its

affiliated companies) became one of Legg Mason's largest

- 5 -

shareholders. (Id. ¶ 17). On March 6, 2006, three months after the CAM Swap closing, Legg Mason issued a press release announcing that Citigroup planned to release its holdings of Legg Mason common stock and sell approximately 8 million shares (or 9.2 million shares if it fully exercised its over-allotment option). (Id. ¶¶ 18, 19). The sale would be done by a secondary public offering (the "Secondary Offering") pursuant to a Registration Statement on Form S-3 filed by Legg Mason on February 27, 2006. (Id. ¶ 19). Citigroup served as the underwriter of the Secondary Offering. (Id. ¶ 9). The Registration Statement was signed by both Mason and Daley, along with others. (Id. ¶ 19).

On March 9, 2006, the Prospectus for the Secondary Offering (the "Prospectus"), which was incorporated into the Registration Statement, was declared effective and Citigroup began selling off 9 million shares of Legg Mason stock to the public at a price of $125 per share. (Id. ¶ 20). The Prospectus disclosed that the selling shareholder was AMAD Holdings, Inc. ("AMAD"), a wholly owned subsidiary of Citigroup, and that an additional 1,350,000 shares of common stock were available to be sold to cover over-allotments. (Id.).

## 4. Disclosures in the Registration Statement

The Prospectus contained a series of risk disclosures that claimed to warn investors of the risks associated with the company and its operations. (Id. ¶ 43). For example, the Prospectus warned that "Assets Under Management May Be Withdrawn." (Id. ¶ 44). It stated:

- 6 -

> [M]utual fund investors may redeem their
> investments in the funds at any time without
> prior notice. Institutional and individual
> clients can terminate their relationships
> with us, reduce the aggregate amount of
> assets under management, or shift their funds
> to other types of accounts with different
> rate structures for any number of reasons,
> including investment performance, changes in
> prevailing interest rates, changes in
> investment preferences of clients, changes in
> our reputation in the marketplace, changes in
> management or control of clients or third
> party distributors with whom we have
> relationships, loss of key investment
> management personnel and financial market
> performance.

(Id.).

The Prospectus specifically addressed the possibility

of asset management professionals and their clients leaving the

company:

> The market for experienced asset management
> professionals is extremely competitive and is
> increasingly characterized by the frequent
> movement of employees among different firms.
> . . . In addition, since many of the
> individual employees at our subsidiaries
> often maintain a strong, personal
> relationship with their clients that is based
> on the clients' trust in the employee, the
> departure of one or more of these employees
> could cause the subsidiary to lose client
> accounts, which could have a material adverse
> effect on our results of operations and
> financial condition.
>
> . . .
>
> . . . CAM will be transitioning from
> being a unit of Citigroup to being a part of
> Legg Mason, which will entail many changes,
> including changes in senior management and in
> administrative and other support. . . . If we
> are unable to retain the key asset management
> personnel of CAM, because of any of these
> transitions or for any other reasons, it
> could have an adverse impact on CAM's
> business. Similarly, if CAM is unable to
> retain its existing . . . client
> relationships as a result of any of the

- 7 -

> uncertainties discussed above or for any
> other reasons, it could have an adverse
> impact on CAM's business.

(Holland Decl. Ex. A at 10, 13).[1]

### 5. Defendants' Omissions in the Registration Statement for the Secondary Offering

The Registration Statement for the Secondary Offering did not specifically disclose the following four matters:

#### a. Peter Wilby's Planned Departure

At the time of the Secondary Offering, Peter Wilby, a CAM asset manager, had decided to leave Legg Mason to start his own firm, Stone Harbor Investment Partners ("Stone Harbor"), and to take $8.5 billion in client assets with him. (Compl. ¶ 24). He had negotiated a deal, however, to stay with Legg Mason until March 2006 to help with the transition. (Id. ¶ 24). Legg Mason began negotiating with Wilby as early as October 2005 to keep him on during the transition. (Id. ¶ 25). In April 2006, Wilby publicly announced the formation of Stone Harbor and left his position at Legg Mason. He took to Stone Harbor $8.5 billion in client assets that he had previously managed at CAM. He also took dozens of Legg Mason employees (who were former CAM employees). (Id. ¶ 26).

#### b. Increase in Customer Withdrawals

At the time of the Secondary Offering, Legg Mason was experiencing an increase in customer withdrawals. (Id. ¶ 29).

---

[1] I may take judicial notice of documents incorporated by reference into the plaintiffs' pleadings and documents publicly filed with the Securities Exchange Commission. See Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991); In re the AES Corp. Sec. Litig., 825 F. Supp. 578, 584 & n.6 (S.D.N.Y. 1993).

The increase in customer withdrawals was a result of broker attrition: starting when the CAM Swap was announced, some Legg Mason brokers decided to leave rather than work for Citigroup's brokerage arm, Smith Barney. (Id. ¶ 30). Many of these brokers took clients with them, resulting in increased customer withdrawals of assets from Legg Mason. (Id.). By the Secondary Offering, broker attrition was increasing, as were customer withdrawals from Legg Mason. (Id.).

## c. Integration-Related Expenses

Legg Mason was also experiencing a dramatic increase in integration-related expenses at the time of the Secondary Offering. (Id. ¶ 33). This increase greatly exceeded the expense figures in the company's internal budget. (Id.). By the time of the Secondary Offering, Legg Mason was spending considerable and increasing time and resources on integrating its operations with those acquired in the CAM Swap and was attempting to eliminate redundant costs. This effort was largely unsuccessful. (Id. ¶ 34).

One such example of an integration-related expense related to information technology. (Id. ¶ 35). Citigroup granted Legg Mason an 18-month license to use the propriety information technology systems used to handle trading and customer processes following the CAM Swap. (Id.). If at the end of the 18-month license period Legg Mason was unable to develop and transition to its own systems, it would pay substantial licensing fees to Citigroup. (Id.). Legg Mason quickly attempted to develop and transition to its own system and spent

increasing amount of capital on the project, far exceeding its
internal projected expenses. (Id.).

### d.  Distribution Fees Owed

In using third-party distributors to sell its financial
products, Legg Mason paid these distributors -- primarily mutual
funds -- fees. (Id. ¶ 39). The Registration Statement failed to
disclose that Legg Mason owed and had failed to pay approximately
$12 million in distribution fees related to the CAM business to
third-party distributors at the time of the Secondary Offering.
(Id. ¶¶ 38, 40).

### 6.  Announcements Following the Secondary Offering

Legg Mason reported disappointing financial results
following the closing of the Secondary Offering. (Id. ¶ 45). On
May 10, 2006, Legg Mason disclosed that its fourth quarter 2006
earnings missed previous estimates. (Id. ¶ 47). Leading up to
the announcement, analysts and investors were concerned that the
price of Legg Mason common stock fell from over $118 to $112 per
share and that the company was not performing as expected. (Id.
¶ 46). The company reported net income of $1.03 per share;
previous estimates had been $1.25 per share. (Id. ¶¶ 47, 76).
It also announced that costs rose quicker than revenues following
the CAM Swap. (Id.).

Defendants blamed the expense overruns on the costs
associated with combining and operating the former Citigroup
division and retaining its employees. (Id. ¶ 47). Mason stated,
"We will continue to have dual costs," and "[t]here's nothing we
can do about it." (Id.). The market had previously been led to

believe that Legg Mason would achieve the previous earnings estimates based on a lower cost structure, despite the fact that expenses nearly tripled after the CAM Swap, and that these costs were already accounted for in financial projections.  (Id.). Mason stated:

> Our timetable to complete this integration appears to be on target with little if any slippage.
>
> Financial results will continue to be confusing as we go through the process of employee reductions, redundancy, dual systems, stay bonuses and adjusting to our new size.  As I have stated in the past, it will probably be difficult until the September quarter to show results that reflect our actual and future earnings capacity.
>
> Most of our primary asset managers had solid positive asset flows during the March quarter.

(Id. ¶ 76).

Revenues also declined as investors withdrew $11 billion from money-market funds and withdrew from stock and bond funds acquired from Citigroup.  (Id. ¶ 47).  Additionally, the brokerage unit continued to perform poorly, with a loss of $2.2 million.  (Id.).  The unit had posted a gain of $31.6 million a year earlier.  (Id.).  Finally, the Legg Mason Value Trust reported a loss of 1.3%, although the S&P 500 was up 5.6% for that period.  (Id.).  In response to the announcement, the price of Legg Mason common stock declined from a closing price of $116 per share on May 9, 2006, to a closing price of $101.40 per share on May 12, 2006.  (Id. ¶¶ 48, 78).

On July 25, 2006, Legg Mason again missed income estimates, reporting income of $1.08 per share instead of the

$1.23 per share the market had been led to believe would be achieved. (Id. ¶¶ 50, 79). The same day, the company issued a press release announcing the financial results for the quarter ending June 30, 2006. (Id.). It reported revenues declined 1.3% "due primarily to a significant decrease in performance fees received in the quarter and reduced market values of equity assets under management." (Id.). Furthermore, "[a]ssets under management fell approximately 1.5% from $868 billion at March 31 to $855 billion, due principally to $7 billion in client cash outflows and to equity asset depreciation caused by a difficult market environment." (Id.). Following the earnings release, the price of Legg Mason stock declined from $94.33 per share to $86.32 per share on extremely heavy trading volume. (Id. ¶¶ 51, 80). Despite these developments, defendants continued to conceal the true condition of the company. (Id. ¶ 80).

On October 10, 2006, Legg Mason issued a press release regarding its expected financial results for the quarter ending September 30, reporting that "it expects its net income for the quarter ended September 30, 2006 to be below analysts' consensus estimates and to be in the range of $.96 to $1.02 per diluted share, or $138 million to $148 million." (Id. ¶¶ 52, 81). Legg Mason attributed the numbers to several factors: (1) lower revenues than expected, with revenues down approximately 1% from the previous quarter (attributable in part to changes in the mix of the company's mutual fund assets under management during the quarter) and (2) approximately $12 million ($.04 per diluted share) in unanticipated mutual fund distribution fee expenses payable by its acquired business to its principal third-party

distributor that related to prior quarters. (Id.). In response
to the announcement, the price of Legg Mason stock declined from
$105.31 to $87.15 per share, representing a 30% decline from the
$125 Secondary Offering price. (Id. ¶¶ 53, 82).

## B.    **Procedural History**

Robert Garber, individually and on behalf of all others
similarly situated, filed his original complaint on October 16,
2006.    On October 25, 2006, Harthia Bockman, individually and on
behalf of all others similarly situated, filed a related
complaint.    On December 15, 2006, the City Westland Police and
Fire Retirement System, West Virginia Laborers' Pension Trust
Fund, and Wirral MBC on Behalf of Merseyside Pension Fund
("Merseyside") (together, the "Pension Fund Group") moved to be
appointed lead plaintiff and to consolidate the two actions.
Their motions were unopposed.    On January 11, 2007, Judge Castel
ordered the Pension Fund Group lead plaintiff for the class and
ordered the actions consolidated.    Lead plaintiff pursues this
action on behalf of all persons who purchased common stock of
Legg Mason between February 1, 2006 and October 10, 2006.

On April 16, 2007, the Pension Fund Group filed its
consolidated amended complaint against Legg Mason, Citigroup, and
Mason and Daley individually, alleging violation of Sections 11,
12(a)(2), and 15 of the Securities Act and Sections 20(a) and
10(b) of the Exchange Act and Rule 10b-5.    On April 25, 2007, the
consolidated cases were transferred to me.    No class has been
certified to date.

- 13 -

On June 15, 2007, Citigroup, Legg Mason, Mason, and Daley moved to dismiss the respective claims asserted against them. For the following reasons, the motions are granted.

## DISCUSSION

### A.   Standard on a Motion to Dismiss

On a motion to dismiss pursuant to Federal Rule of Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations of the non-moving party as true and draw all reasonable inferences in its favor. Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996); see Erickson v. Pardus, 127 S. Ct. 2197, 2199 (2007) (per curiam); Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).

In its recent decision in Bell Atlantic Corp., the Supreme Court announced the "retirement" of the oft-quoted "no set of facts" language from Conley v. Gibson, 355 U.S. 41, 45-47 (1957), adopting in its place a "plausibility" requirement. Bell Atl. Corp., 127 S. Ct. at 1969. As interpreted by the Second Circuit, Bell Atlantic Corp. did not announce a "universal standard of heightened fact pleading, but . . . instead requir[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007). The question is whether the pleading alleges "'enough facts to state a claim for relief that is plausible on its face.'" Patane v. Clark, 508 F.3d 106, 111-12 (2d Cir. 2007) (quoting Bell Atl. Corp., 127 S. Ct. at 1974).

- 14 -

In deciding a motion to dismiss, a court may consider the pleadings and attached exhibits, documents incorporated by reference, and matters subject to judicial notice. See Prentice v. Apfel, 11 F. Supp. 2d 420, 424 (S.D.N.Y. 1998) (citing Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)). "'[B]ald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations'" and will not defeat the motion. Gavish v. Revlon, Inc., No. 00 Civ. 7291 (SHS), 2004 WL 2210269, at *10 (S.D.N.Y. Sept. 30, 2004) (quoting Citibank, N.A. v. Itochu Int'l, Inc., No. 01 Civ. 6007 (GBD), 2003 WL 1797847, at *1 (S.D.N.Y. Apr. 4, 2003)).

## B. Section 11 and 12(a)(2) Claims Against All Defendants

### 1. Applicable Law

To establish a claim under Section 11 of the 1933 Act, a plaintiff must allege: (1) defendant is a signer of a registration statement, director of the issuer, or underwriter for the offering (or other individual specified by the statute); (2) plaintiff purchased the registered securities; and (3) any part of the registration statement for the offering contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein not misleading. See 15 U.S.C. § 77k(a). To establish a claim under Section 12(a)(2) of the 1933 Act, a plaintiff must prove that (1) defendants sold or offered a security (2) by means of a prospectus (3) that included an untrue statement of material fact or omitted a material fact necessary to make such statements not

- 15 -

misleading.  See 15 U.S.C. § 771(a)(2).[2]  Although fraud "is not
an element or a requisite to a claim under Section 11 or Section
12(a)(2)," those claims "may be -- and often are -- predicated on
fraud."  Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004);
accord In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370,
387 (S.D.N.Y. 2007).  Several additional principles govern the
analysis of Section 11 and 12(a)(2) claims.

### a.  **Materiality and the Duty to Disclose**

To state a claim under Sections 11 and 12(a)(2), a
plaintiff must allege that defendants had a legal obligation to
disclose the allegedly omitted information.  See Geiger v.
Solomon-Page Group, Ltd., 933 F. Supp. 1180, 1187-88 (S.D.N.Y.
1996) (defendants not required to disclose allegedly omitted
information, warranting dismissal).

An omission or misrepresentation must be material --
there must be a substantial likelihood that a reasonably prudent
investor would consider it important in making a decision -- for
a duty to disclose to attach.  Steinberg v. PRT Group, Inc., 88
F. Supp. 2d 294, 300 (S.D.N.Y. 2000).  Materiality is established
upon a showing of "a substantial likelihood that the disclosure
of the omitted fact would have been viewed by the reasonable
investor as having significantly altered the 'total mix' of
information made available."  TSC Indus., Inc. v. Northway, Inc.,
426 U.S. 438, 449 (1976); see In re APAC Teleservices, Inc. Sec.

---

[2]  Therefore, when a registration statement incorporates the
prospectus, as it does in the instant case, only the prospectus
needs to contain a material misstatement or omission for
liability to attach under both sections.  See Steinberg v. PRT
Group, Inc., 88 F. Supp. 2d 294, 299-300 (S.D.N.Y. 2000).

<u>Litiq.</u>, No. 97 Civ. 9145 (BSJ), 1999 WL 1052004, at *9 (S.D.N.Y. Nov. 19, 1999). "It is well-established law that the securities laws do not require disclosure of information that is publicly known." <u>In re Progress Energy, Inc.</u>, 371 F. Supp. 2d 548, 552-53 (S.D.N.Y. 2005).

Ordinarily, materiality is a mixed question of law and fact left to the finder of fact to determine. <u>TSC</u>, 426 U.S. at 450. Therefore, "the standard for [dismissing] is high: '[A] complaint may not properly be dismissed pursuant to 12(b)(6) . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" <u>Milman v. Box Hill Sys. Corp.</u>, 72 F. Supp. 2d 220, 228 (S.D.N.Y. 1999) (quoting <u>Goldman v. Belden</u>, 754 F.2d 1059, 1067 (2d Cir. 1985) (alterations in original); <u>see also</u> <u>Feinman v. Dean Witter Reynolds, Inc.</u>, 84 F.3d 539, 540-41 (2d Cir. 1996).

### b. **Item 303**

Form S-3, a registration statement filed by certain issuers in connection with a secondary offering, permits an offeror to incorporate other periodic filings, such as Forms 10-K and 10-Q, by reference. Item 303 of Securities Exchange Commission ("SEC") Regulation S-K provides guidance on what should be included in incorporated forms. <u>See</u> <u>In re Corning, Inc. Sec. Litiq.</u>, 349 F. Supp. 2d 698, 716 (S.D.N.Y. 2004). Item 303 requires a registrant to disclose "any known trends or uncertainties that have had or that the registrant reasonably

- 17 -

expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). "An omission of fact 'required to be stated' under Item 303 will generally produce liability under section 11." In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d 189, 211 (S.D.N.Y. 2004). Plaintiffs must therefore plead facts indicating that the alleged known trends existed at the time of the purported misleading statements or omissions. See In re Turkcell Iletisim Hizmetler A.S. Sec. Litig., 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) ("The complaint fails to allege that there [were] 'trends' or that they were 'known' as of the date the Prospectus became effective.").

### c. **Pleading Requirements Under Rule 9(b)**

The Second Circuit has held "that the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud." Rombach, 355 F.3d at 171 ("[W]hile a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b).").

### 2. **Application**

Merseyside alleges that the Registration Statement and Prospectus for the Secondary Offering were negligently prepared and, as a result, defendants failed to disclose several material facts relating to changes to Legg Mason's continuing operations.[3]

---

[3] In the consolidated amended complaint, only Merseyside asserts Securities Act claims against defendants. The entire Pension Fund Group asserts the Exchange Act claims.

Merseyside argues that each of the following facts alone would have altered the total mix of information available to investors in the Secondary Offering: (1) the loss of Wilby and the associated $8.5 billion withdrawal of client assets; (2) increasing customer withdrawals; (3) increasing integration-related expenses; and (4) unpaid distribution fees.

### a. **Adequacy of Pleading**

In the consolidated amended complaint, Merseyside pleads negligence with respect to the Securities Act claims and specifically disclaims "that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent." (Compl. ¶¶ 54, 62). Defendants argue that, nonetheless, the consolidated amended complaint fails to plead fraud with particularity under Rule 9(b), compliance with which is demanded because the claims sound in fraud and rely on allegedly fraudulent acts. Because plaintiffs have specifically disclaimed any component of fraud in their Sections 11 and 12(a)(2) claims, there are no "averments of fraud." See Rombach, 355 F.3d at 171. Rather, these allegations clearly "sound in negligence," do not rely on fraudulent acts, and allege no fraudulent intent. See id. at 178; In re Prestige Brands Holding, Inc., No. 05 Civ. 06924 (CLB), 2006 WL 2147719, at *8 (S.D.N.Y. July 10, 2006) ("Plaintiffs disclaim any intention to plead fraud except with respect to the Rule 10b-5 claims . . . and of course they are not required to. . . . A representation of fact in a prospectus may be material, false and misleading without regard to the motive or intent of the author.").

Therefore, Merseyside's Securities Acts claims are subject only to the pleading requirements of Rule 8(a).

### b. The Duty to Disclose and Materiality

I discuss defendants' duty to disclose and the materiality of each of the four purported materially misleading nondisclosures.

### i. Wilby's Departure

Plaintiffs have failed to adequately plead materiality as a matter of law with respect to the most significant of the alleged omissions -- Wilby's planned departure.

First, by their very nature, swap transactions -- in this case, the swap of a brokerage business for an asset management business -- will generate changes in personnel and increases in expenses (at least initially). Any reasonable investor would know that this type of significant change in ownership and structure would lead to brokers and asset managers changing jobs.

Second, as noted above, the risk of the loss of key personnel and accompanying clients was specifically disclosed in the Prospectus. It stated: "The market for experienced asset management professionals is extremely competitive and is increasingly characterized by the frequent movement of employees among different firms" and "the departure of one or more of these employees could cause the subsidiary to lose client accounts, which could have a material adverse effect on our results of operations and financial condition." (Holland Decl. Ex. A at 10, 13).

Third, Wilby's departure was already publicly reported in several news articles, including an article in Fortune Magazine on January 30, 2006, prior to the Secondary Offering. (Holland Decl. Ex. F). Defendants therefore had no duty under the securities laws to disclose Wilby's planned departure. See White v. H & R Block, Inc., No. 02 Civ. 8965 (MBM), 2004 WL 1698628, at *5-*6, *14 (S.D.N.Y. July 28, 2004) (concluding that public court filings, press releases, and articles about litigation were sufficient public disclosure).[4]

## ii. **Increasing Customer Withdrawals**

The consolidated amended complaint merely alleges that Legg Mason was "experiencing an increase" in broker attrition and customer withdrawals. Merseyside alleges no specific facts regarding the volume of customer withdrawals or the rate of broker defections at the time of the Secondary Offering. While Merseyside's Securities Acts claims are not required to be supported by "detailed factual allegations," Merseyside must still plead facts sufficient to render the claims "plausible" and they must provide more than a "formulaic recitation of the elements of a cause of action." Bell Atl. Corp., 127 S. Ct. at 1964-65; see In re Merrill Lynch & Co., Inc. Research Reports

---

[4] I may take judicial notice of these articles. See Pension Comm. of the U. of Montreal Pension Plan v. Banc of Am. Sec., LLC, No. 05 Civ. 9016 (SAS), 2007 WL 528703, at *4 (S.D.N.Y. Feb. 20, 2007); In re Merrill Lynch & Co., 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003) ("The Court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion [to dismiss] into one for summary judgment.").

- 21 -

Sec. Litiq., 272 F. Supp. 2d 243, 253 (S.D.N.Y. 2003); see also Oxford Asset Mqmt. Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal" of Section 11 claims.). Merseyside fails to do so.

The Prospectus disclosed that it was the nature of Legg Mason's business that "clients can [presently] terminate their relationships with us . . . for any number of reasons, including . . . loss of key investment management personnel," which provides additional support that there was no duty to disclose. (Holland Decl. Ex. A at 8). See Schoenhaut v. Am. Sensors, Inc., 986 F. Supp. 785, 793 (S.D.N.Y. 1997) (concluding that failure to disclose the level of sales of a key customer was not a material omission because the Prospectus did not list the current volume of sales for the customer, predict future sales, or suggest that it would remain a customer, and warned that the largest customers may vary over time and that the loss of a large customer could have a material affect on the company).

### iii. **Integration-Related Expenses**

Merseyside alleges that Legg Mason experienced a dramatic increase in integration-related expenses in excess of its internal budget. Merseyside fails, however, to describe in any way the magnitude of the increase, the initial projections, or by how much the actual costs exceeded the internal budget. The pleadings are simply too conclusory, as they offer no possibility at all of assessing materiality as a matter of law.

### iv. Owed Distribution Fees

The alleged material omission from the Prospectus of $12 million in owed distribution fees accounted for only 0.4% of Legg Mason's annual revenue. This share is simply too small to be material as a matter of law when considered in the broader context of the company's revenues and expenses.[5] See In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 630-31 (S.D.N.Y. 2005) ("Changing the accounting treatment of approximately 0.3% of JPM Chase's total assets from trades to loans would not have been material to investors."); In re Duke Energy Corp. Sec. Litig., 282 F. Supp. 2d 158, 161-62 (S.D.N.Y. 2003) (inflation of revenues amounting to approximately 0.3% of company's total revenues is immaterial percentage as a matter of law); see also, Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997) ("Defendants' alleged overstatement of assets by $6.8 million was immaterial as a matter of law [because] a reasonable investor . . . would not have been put off by an asset column that was 2% smaller."); In re Westinghouse Sec. Litig., 90 F.3d 696, 715 (3d Cir. 1996) (1.2% overstatement of total assets was immaterial).

Furthermore, disclosure of the owed fees was not required under Item 303, because Merseyside fails to allege the trend was "known" at the time of the Secondary Offering.

---

[5] As a general matter, I reject defendants' implication that issues of materiality should be considered in strict terms of the omission's relative percentage impact on a company's total assets or revenue. There is no bright-line rule that if an omission or misstatement falls below a certain percentage of a company's total assets or revenue that it is automatically rendered immaterial -- rather a court will assess the entire context of the alleged omission.

- 23 -

Merseyside merely pleads that "Legg Mason had at least $12 million of owed, but unpaid, distribution fees" but not that it knew of the fees. Merseyside argues that pleading a trend's existence is enough to support a claim, and whether defendants were actually aware of the trend is not legally operative. Merseyside misreads Item 303, which requires that the trend actually be known.[6]

As explained above, Merseyside has failed to state a claim upon which relief may be granted under Sections 11 and 12(a)(2), and, accordingly, these claims are dismissed.

## C. Section 10(b) and Rule 10b-5 Claims Against Legg Mason and the Individual Defendants

### 1. Applicable Law

To state a cause of action under Section 10(b) and Rule 10b-5, plaintiffs must allege that defendants: (1) in connection with a purchase or sale of securities; (2) with scienter; (3) made a material false representation or omitted to disclose material information; (4) upon which plaintiff relied; (5) proximately causing plaintiff to suffer injury. Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005); see also Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

#### a. Pleading Requirements for Securities Fraud

Securities fraud allegations under Section 10(b) and Rule 10b-5 are subject to the heightened pleading requirements of

---

[6] Legg Mason's October 10, 2006 press release stating that it had discovered "unanticipated mutual fund distribution fee expenses payable to our principal third-party distributor that relate to prior quarters," further supports defendants' claim that the trend was unknown at the time of the Secondary Offering. (Compl. ¶¶ 52, 81).

Federal Rule of Civil Procedure 9(b) and the PSLRA. Rule 9(b) requires that, whenever a complaint contains allegations of fraud, the circumstances constituting fraud shall be stated with particularity. See Fed. R. Civ. P. 9(b); see also Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996) (noting that the fraudulent statements or conduct must be stated with particularity). "[A] complaint making such allegations must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)). A plaintiff must "set forth the who, what, when, where and how of the alleged fraud." U.S. ex rel. Woods v. Empire Blue Cross & Blue Shield, No. 99 Civ. 4968 (DC), 2002 WL 1905899, at *4 (S.D.N.Y. Aug. 19, 2002) (quotation omitted).

The PSLRA requires securities fraud plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). While the PSLRA does not require plaintiffs to plead "every single fact upon which their beliefs concerning false or misleading statements are based," it does require the facts alleged to be "sufficient to support a reasonable belief as to the misleading nature of the statement or

- 25 -

omission." Novak v. Kasaks, 216 F.3d 300, 313-14 & n.1 (2d Cir. 2000).

"Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Id. at 309. To survive a motion to dismiss, plaintiff "needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001). For example, an "unsupported general claim of the existence of confidential company sales reports that revealed [unfavorable figures] is insufficient to survive a motion to dismiss." San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 812 (2d Cir. 1996).

Additionally, the Second Circuit does not recognize "fraud by hindsight." Shields, 25 F.3d at 1129. "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (quotations omitted); see also Novak, 216 F.3d at 309.

## b. **Materiality**

The standard for assessing materiality under Section 10(b) and Rule 10b-5 is the same as under Sections 11 and 12(a)(2). See I. Meyer Pincus & Assocs. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991); Geiger, 933 F. Supp. at 1184.

## c. **Scienter**

To satisfy the Rule 9(b) and PSLRA pleading requirements with respect to scienter, plaintiffs must allege

- 26 -

facts giving rise to a "strong inference" of fraudulent intent. Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001); see Goplen v. 51job, Inc., 453 F. Supp. 2d 759, 770-71 (S.D.N.Y. 2006).[7] The Supreme Court has held that for the inference of fraudulent intent to qualify as "strong," it must be more than merely plausible or reasonable -- it "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2504-05 (2007).

The requisite intent may be established either by alleging facts (1) showing that defendants had both motive and opportunity to commit fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness. Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995). With respect to motive, "[g]eneral allegations that the defendants acted in their economic self-interest are not enough," Ganino v. Citizens Utils. Co., 228 F.3d 154, 170 (2d Cir. 2000), and "[m]otives that are generally possessed by most corporate directors and officers do not suffice," Kalnit, 264 F.3d at 139. As to circumstantial evidence of conscious misbehavior or recklessness, these have been defined by the Second Circuit as "deliberate illegal behavior," and "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care," respectively. Novak, 216 F.3d at 308 (quotations omitted).

---

[7]    The Supreme Court recently noted that this circuit's formulation of the pleading demands for scienter have historically been "the most stringent" of all the circuits. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2508 (2007).

### d. **Loss Causation**

To state a Section 10(b) and Rule 10b-5 claim, plaintiffs must allege loss causation. See Lentell, 396 F.3d at 172. Loss causation is "a causal connection between the material misrepresentation and the loss." Dura, 544 U.S. at 342. "[A] plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell, 396 F.3d at 173 (quotation and citation omitted). "[I]f the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." Id. at 174 (quotations and citations omitted).

"[I]f the loss was caused by an intervening event, like a general fall in the price of [ ] stocks, the chain of causation will not have been established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003). When the plaintiff's loss, however, "coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases." Lentell, 396 F.3d at 174 (quotation omitted).

### 2. **Application**

The consolidated amended complaint alleges that defendants:

- 28 -

> (a) employed devices, schemes and artifices
> to defraud; (b) made untrue statements of
> material facts or omitted to state material
> facts necessary in order to make the
> statements made, in light of the
> circumstances under which they were made, not
> misleading; or (c) engaged in acts, practices
> and a course of business that operated as a
> fraud or deceit upon Plaintiffs and others
> similarly situated in connection with their
> purchases of Legg Mason publicly traded
> securities during the Class Period.

(Compl. ¶ 86).

### a. **Pleading with Particularity**

With respect to the allegations that defendants
withheld information regarding increasing customer withdrawals
and increasing integration-related expenses at the time of the
Secondary Offering, plaintiffs fail to adequately describe the
facts upon which they base their beliefs. As previously noted,
plaintiffs are required to plead fraud with particularity and
must cite the sources of data that indicate that the basis of the
alleged omission existed. Plaintiffs cite no reports or data
supporting the existence of either of these alleged trends, and
therefore fail to state facts on which their belief of fraud
could reasonably be based. Plaintiffs' Section 10(b) and Rule
10b-5 claims regarding increasing customer withdrawals and
integration-related expenses must therefore be dismissed.

### b. **Materiality**

As previously discussed, plaintiffs fail to allege that
any of the alleged omissions were material. This provides an
independent basis for dismissing plaintiffs' Section 10(b) and
Rule 10b-5 claims.

## c.    Loss Causation

Plaintiffs allege that "in a series of partial disclosures, Legg Mason slowly began to reveal its true condition and the problems with the CAM Swap." (Compl. ¶ 75). As a preliminary matter, disclosures attributing a share price drop to the failure to meet earnings estimates are not alone sufficient to plead loss causation. See Leykin v. AT&T Corp., 423 F. Supp. 2d 229, 239 (S.D.N.Y. 2006) (allegations that plaintiff purchased shares at an artificially inflated price do not, without more, plead loss causation); see also Dura, 544 U.S. at 347.

Additionally, none of the public statements made by Legg Mason or its executives after the Secondary Offering correctively disclosed three of the alleged omissions -- increasing integration-related expenses, Wilby's planned departure, and increasing customer withdrawals -- so as to cause the price of Legg Mason shares to drop. Regarding integration-related expenses, Legg Mason announced on May 10, 2006 that its "timetable to complete [the] integration appears to be on target with little if any slippage." (Compl. ¶ 76 (emphasis added)). On October 10, 2006, Legg Mason "confirmed that its integration of the business . . . remains on schedule, and that it continues to expect to achieve the previously announced cost savings from integration." (Holland Decl. Ex. E.). These statements are not corrective disclosures -- quite the opposite, they continued to inform the market that integration was proceeding as expected.

Plaintiffs' reliance on (1) the May 10, 2006 announcement that most of the company's "primary asset managers

had solid positive net asset flows during the March quarter" and (2) the July 25, 2006 announcement that there was a further decline in revenues "due primarily to a significant decrease in performance fees received in the quarter and reduced market values of equity assets under management" as corrective disclosures is misplaced. (Id. ¶¶ 50, 76, 79). These statements failed to specifically attribute the losses to Wilby's departure, increasing integration-related expenses, or increasing customer withdrawals occurring at the time of the Secondary Offering. While the July 25 announcement did state that assets fell "due principally to $7 billion in client cash outflows and to equity asset depreciation caused by a difficult market environment," this disclosure -- despite mentioning client outflows -- did not indicate that the outflows were occurring at the time of the Secondary Offering or were attributable to anything other than the market.

Accordingly, failure to plead loss causation is another independent basis for dismissing plaintiffs' claims regarding (1) Wilby's planned departure, (2) increasing integration-related expenses, and (3) increasing customer withdrawals occurring at the time of the Secondary Offering.

Only the $12 million in distribution fees plaintiffs allege were owed at the time of the Secondary Offering was the subject of a corrective disclosure. On October 10, 2006, the company reported lower revenues, attributing them to "changes in the mix of the company's mutual fund assets under management" and "approximately $12 million . . . in unanticipated mutual fund

- 31 -

distribution fee expenses . . . that relate to prior quarters."
(Id. ¶¶ 52, 81). Although the statement does not specifically
state that the fees were attributable to the quarter when the
Secondary Offering occurred, this disclosure is nonetheless
sufficiently corrective in nature.

### d.  **Scienter**

Plaintiffs allege that defendants "disseminated or
approved the false statements . . . which they knew or
deliberately disregarded were misleading [sic] in that they
contained misrepresentations and failed to disclose material
facts necessary in order to make the statements made, in light of
the circumstances under which they were made, not misleading."
(Id. ¶ 85).  Plaintiffs' pleading fails to comply with the
heightened pleading requirements for scienter under Rule 9(b) and
the PSLRA.

The facts pled fail to support a strong inference of
fraudulent intent -- the allegations are not "cogent and at least
as compelling as any opposing inference of nonfraudulent intent."
Tellabs, 127 S. Ct. at 2504-05.  Plaintiffs plead absolutely no
facts supporting the assertion that defendants had the motive and
opportunity to commit fraud.  They do not even plead that
defendants acted with self-interest.  Puzzlingly, a discussion of
motive is entirely absent from the consolidated amended
complaint.

Plaintiffs identify no internal reports of which
defendants were aware and failed to disclose, and do not indicate
specific data used by defendants in their fraud.  The facts

alleged simply do not rise to the level of circumstantial evidence that would be evidence of conscious misbehavior or recklessness. There is no mention of "deliberate illegal behavior," or "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." Novak, 216 F.3d at 308 (quotations omitted). Ultimately, there are opposing inferences of innocent omission that are far more compelling than an inference of scienter.

Plaintiffs' generic, conclusory statement that fraudulent intent existed is simply not enough to meet the heightened pleading standards for securities fraud cases. This failure to properly plead scienter provides an independent basis for dismissing plaintiffs' fraud claims. See Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC, 474 F. Supp. 2d 505, 520 (S.D.N.Y. 2007).

For the foregoing reasons, plaintiffs' Section 10(b) and Rule 10b-5 claims are dismissed.

## D. Section 15 of the Securities Act and Section 20(a) of the Exchange Act

### 1. Applicable Law

To plead a claim under Section 15 of the 1933 Act and Section 20(a) of the 1934 Act, plaintiffs must allege (1) a primary violation of the corresponding Act by a controlled person and (2) direct or indirect control by the defendant of the primary violator. See In re Adelphia Commc'ns Corp. Sec. and Derivative Litig., No. 03 MD 1529 (LMM), 2007 WL 2615928, at * 10 (S.D.N.Y. Sept. 10, 2007). Additionally, Section 20(a) claims

- 33 -

must allege "culpable participation." Id. (citing Wallace v. Buttar, 378 F.3d 182 (2d Cir. 2004). Mere "[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity." In re Parmalat Sec. Litig., 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006).

## 2. Application

As there are no surviving primary violations upon which plaintiffs could rest these claims, plaintiffs' Section 15 and Section 20(a) claims are dismissed. See SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996) ("[T]o establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person.").

### CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are granted. The Clerk of the Court shall enter judgment dismissing the consolidated amended complaint, with prejudice, and with costs but without fees.

SO ORDERED.

Dated:    New York, New York
          March 17, 2008

DENNY CHIN
United States District Judge

- 34 -

**APPEARANCES:**

For Plaintiff:

        COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS LLP
           By:  Samuel Howard Rudman, Esq.
               David Avi Rósenfeld, Esq.
               Joseph Russello, Esq.
               Mario Alba, Jr., Esq.
        58 South Service Road, Suite 200
        Melville, New York  11747

For Defendants Legg Mason, Inc., Raymond A. Mason, and
Charles J. Daley:

        MILBANK, TWEED, HADLEY & MCCLOY LLP
           By:  James N. Benedict, Esq.
               Sean Miles Murphy, Esq.
               Christopher Neil Gray, Esq.
               Deborah A. Elman, Esq.
               Rachel Penski, Esq.
        1 Chase Manhattan Plaza
        New York, New York  10005

For Defendant Citigroup Global Markets Inc.:

        CLIFFORD CHANCE US, LLP
           By:  Mark Adam Kirsch, Esq.
               Mark Holland, Esq.
               Mary Kathryn Dulka, Esq.
               Valeria Calafiore, Esq.
        31 West 52nd Street
        New York, New York  10019